**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:24-CR-00070 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE SARA LIOI |
| vs. | : | |
| | : | **MOTION TO DISMISS COUNTS** |
| RODRIGUS CALDWELL, | : | **2, 3, 4, 5 and 6 OF THE INDICTMENT** |
| | : | |
| | : | |
| Defendant. | : | |

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ---, 142 S. Ct. 2111 (2022), the U.S. Supreme Court instructed courts examining firearm statutes to consider only "constitutional text and history." *Id.* at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut that presumption, the Government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* That test is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

Applying the *Bruen* framework, the Court should dismiss the Section 922(g)(1) and (o) charges in Counts 2 through 6 in the Indictment. Both facially and as applied, Sections 922(g)(1) and (o) violate the Second Amendment. Because possessing a firearm comes within the Second Amendment's plain text, Mr. Caldwell's conduct is presumptively protected. The Government cannot rebut that presumption. Felon-disarmament laws did not appear in the United States until the 20th century.

I.     **The *Bruen* Framework**

Applying *Bruen*, the Court must begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* To rebut the presumption of unconstitutionality, the *Bruen* Court held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the challenged statute is unconstitutional. *Id.* at 2132.

The United States Supreme Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136. For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. *Bruen* cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Courts also must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately

after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice but should otherwise afford it little weight. *Id.* That is because "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.*; *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too temporally remote).

Where, as is in this case, a challenged statute "addresses a general societal problem that has persisted since the 18th century," the "inquiry will be fairly straightforward." *Id.* at 2131. The Government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.*; *see also Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) ("To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue.") (quoting *Bruen*, 142 S. Ct. at 2131-32); *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, --- F. Supp. 3d ---, 2023 WL 3355339, at *21 (E.D. Va. May 10, 2023) (holding statute unconstitutional because "[t]he 'general societal problem'" it addressed "far proceeded the Founding," but government had "not demonstrated that the Founders dealt with this problem in a 'distinctly similar' way").

Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. Courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

## II.    Section 922(g)(1) fails *Bruen*'s text-and-history standard.

Under the *Bruen* framework, section 922(g)(1) violates Mr. Caldwell's Second Amendment right to keep and bear arms. The amendment's "plain text" covers Mr. Caldwell's conduct, and a total prohibition on firearm possession therefore presumptively violates the Second Amendment. The Government cannot rebut that presumption. Felons' access to firearms is "a general societal problem that has persisted since the 18th century," and the Government thus must show a robust tradition of regulations "distinctly similar" to section 922(g)(1). *Id.* at 2131. But felon-disarmament statutes did not appear until the 20th century. The "Founders themselves could have adopted" felon-disarmament laws, but they did not do so. *Id.* Because there was no "historical tradition," circa 1791, of regulations "distinctly similar" to section 922(g)(1), the statute violates the Second Amendment. *Id.*

First, the Second Amendment covers Mr. Caldwell's right to possess a firearm. *Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. The Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." *Id.* at 2134-35 (analyzing these three elements in turn). Mr. Caldwell is part of "the people" protected by the Second Amendment—as the Eleventh Circuit noted, felons "are indisputably part of 'the people.'" *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also Range*, 69 F.4th at 101-03 (holding, post-*Bruen*, that felons are among "the people" safeguarded by the

Second Amendment); *United States v. Bullock*, --- F. Supp. 3d ---, 2023 WL 4232309, at *20-21 (S.D. Miss. June 28, 2023) (same) (granting motion to dismiss section 922(g)(1) charge). The handguns Mr. Caldwell allegedly possessed is among the "Arms" protected by the Second Amendment. *See* R. 12, Indictment; *Bruen*, 142 S. Ct. at 2134. And section 922(g)(1)'s outright ban on possessing a firearm covers Mr. Caldwell's right to "keep and bear" them. *Id.* at 2134-35.

Second, because "the Second Amendment's plain text covers [Mr. Caldwell's] conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To rebut the presumption, the Government must establish that section 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Government cannot do so.

The threshold question is whether the problem addressed by section 922(g)(1) is longstanding or more recent. The "general societal problem" at which section 922(g)(1) is directed—felons' access to guns—"has persisted since the 18th century." *Id.* at 2131. As a result, section 922(g)(1)'s ban on Mr. Caldwell possessing a firearm is unconstitutional unless the Government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified. *Id.*; *see Range*, 69 F.4th at 103 (explaining that, in contrast to "regulations targeting longstanding problems," which "must be 'distinctly similar' to a historical analogue," "'modern regulations that were unimaginable at the founding' need only be 'relevantly similar' to one"); *Worth v. Harrington*, --- F. Supp. 3d ---, 2023 WL 2745673, at *16 (D. Minn. Mar. 31, 2023) (dismissing state's proffered historical analogues because they "do not burden the Second Amendment right in a manner distinctly similar to the age requirement Minnesota's permit-to-carry law").

Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms*

*& Explosives*, 700 F.3d 185, 196 (5th Cir. 2012). As one historian found after "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815," "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 LAW & HIST. REV. 139, 142, 143 & n.11 (2007).

Other scholars agree. "[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. REV. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); *see also* Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 WASH. U. L. REV. 1187, 1211 (2015) (similar); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1357 (2009) (similar); Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 HASTINGS L.J. 1371, 1376 (2009) (similar).

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to section 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31; *see Range*, 69 F.4th at 106 (holding "that the Government has not shown that the Nation's historical tradition of firearms regulation supports depriving Range [a convicted felon] of his Second Amendment right to possess a firearm"); *Bullock*, 2023 WL 4232309 at *21-31. The "Founders themselves could have adopted"

6

laws like section 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Bruen*, 142 S. Ct. at 2131. But they declined to do so, and that inaction indicates that section 922(g)(1) is unconstitutional. *Id.*

### III. District courts, including a District Court in the Sixth Circuit, have found 18 U.S.C. § 922(g)(1) is unconstitutional post-*Bruen*.

Since *Bruen* 's issuance, district courts across the country have dismissed section 922(g)(1) charges based on similar motions. *See United States v. Neal*, --- F. Supp. 3d ---, 2024 WL 833607 (N.D. Ill. 2024); *United States v. Freeman*, --- F. Supp. 3d ---, 2023 WL 7325932 (N.D. Ill. 2023); *United States v. Quailes*, --- F. Supp. 3d ---, 2023 WL 5401733 (M.D. Penn. 2023); *United States v. Bullock*, --- F. Supp. 3d ---, 2023 WL 4232309 (S.D. Miss. 2023); *Worth v. Harrington*, --- F. Supp. 3d ---, 2023 WL 2745673 (D. Minn. 2023); *United States v. Williams*, --- F. Supp. 3d ---, No. 23-CR-20201, 2024 WL 731932 (E.D. Mich. Feb. 22, 2024); *United States v. Taylor*, No. 23-CR-40001, 2024 WL 245557 (S.D. Ill. Jan. 22, 2024); *United States v. Jones*, No. 23-CR-74, 2024 WL 86491 (S.D. Miss. Jan. 8, 2024); *United States v. Leblanc*, No. CR 23-00045-BAJ-RLB, 2023 WL 8756694 (M.D. La. Dec. 19, 2023); *United States v. Griffin*, No. 21-CR-00693, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023), *appeal filed*; *United States v. Salme-Negrete*, No. 22 CR 637, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023); *United States v. Delany*, No. 22 CR 463, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023); *United States v. Prince*, No. 1:22-CR-00240, 2023 WL 7220127 (N.D. Ill., Nov. 2, 2023); *United States v. Harper*, No. 1:21-CR-236, 2023 WL 5672311 (M.D. Penn. Sept. 1, 2023); *United States v. Forbis*, No. 4:23-CR-133 (N.D. Okla. Aug. 17, 2023).

Of these cases, particularly noteworthy is one of the most recent decisions to address the issue, *United States v. Williams*, --- F.Supp.3d ---, No. 23-CR-20201, 2024 WL 731932 (E.D. Mich. Feb. 22, 2024). There, a district court within the Sixth Circuit held that section 922(g)(1) is unconstitutional. The *Williams* court found that the government did not identify a historical analog

that is "distinctly similar" or "relevantly similar" to section 922(g)(1). *Id*.; 2024 WL 731932, at *25.

The *Williams* court explained that pre-*Bruen* Sixth Circuit case law does not answer the question of section 922(g)(1)'s constitutionality: "As of the date of this opinion and order, the Supreme Court and the Sixth Circuit have not issued a decision on a post-*Bruen* constitutional challenge to that statute." *Id*. at *5. *Williams* did recognize the Supreme Court's statement in *Heller* that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which are "presumptively lawful regulatory measures." *Id*. at * 2 (quoting *Heller*, 554 U.S. at 262, 627 n.26). However, *Williams* found "instructive" an en banc opinion from the Sixth Circuit that discussed such language: *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) (en banc). There, the en banc Sixth Circuit held that *Heller*'s dicta did not foreclose a challenge to Section 922(g)(4), which prohibited firearm possession by the mentally ill. "In light of the guidance provided by the Sixth Circuit in *Tyler*, the Court finds that *Heller*'s 'presumptively lawful' dicta does not definitively answer the question of whether § 922(g)(1) is constitutional as applied to Defendant. To address this issue, the Court must conduct a constitutional analysis." *Id*. at *6.

Next, the *Williams* court found that the government failed to show that "'the people' in the Second Amendment refers only to law-abiding citizens," and that the "defendant is part of 'the people' in the Second Amendment. *Id*. at *9; *11. The government argued that because Defendant Williams was a convicted felon, he "is excluded from the class of ordinary, responsible, law-abiding citizens whose rights the Second Amendment protects." *Id*. at *8. The *Williams* court did not find it appropriate to interpret "the people" in the Second Amendment differently than, or inconsistent with, how that term is understood in other parts of the Constitution. *Id*. at *11 (citing,

*inter alia*, *United States v. Calhoun*, 2024 WL 36977 (N.D. Ill. Jan. 3, 2024)) ("Since felons are not excluded from First or Fourth Amendment rights, neither should they be excluded from Second Amendment rights, given the Framer's [sic] consistent use of the term 'the people' throughout.").

Finally, the court concluded that the government did not satisfy its burden under *Bruen* to "justify [section 922(g)(1)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 25. After a lengthy analysis, it found that the government failed to show that 18 U.S.C. § 922(g)(1)'s automatic lifetime ban on a felons' firearm possession had either distinct similarity or relevant similarity to historic regulations:

> The government does not point to a historical regulation that is "distinctly similar" to § 922(g)(1). Nor does it show that the laws in the historical record are "relevantly similar" to § 922(g)(1). Those laws do not impose a "comparable burden" to § 922(g)(1)'s permanent and absolute ban on the possession of firearms by felons. Because the government does not identify a historical analog that is "distinctly similar" or "relevantly similar" to § 922(g)(1), the Court is required by Bruen to find the statute unconstitutional as applied to Defendant.

*Id*. at *25. This Court should find the reasoning of *Williams* (and other cases cited *supra* in Part III) persuasive. Section 922(g)(1) is unconstitutional both facially and as applied to Mr. Caldwell.

## IV. Following *Bruen*, prosecuting a defendant for possessing a machine gun violates the fundamental right to keep and bear arms under the Second Amendment.

Count two charges Mr. Caldwell with violating 18 U.S.C. § 922(o). (R. 12: Indictment, PageID 31). Section 922(o), which bans machine gun possession, also violates the Second Amendment both facially and as applied to Mr. Caldwell after *Bruen* because it criminalizes possession of firearms "in common use" for the purpose of self-defense. Further, the statute is inconsistent with the Nation's historical tradition of firearms restrictions. *Heller* confirmed that the right the Second Amendment protects is an individual right that includes "us[ing] arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The word "arms" in the Second Amendment

includes both "armour of defence" and "weapons of offence." *Heller*, 554 U.S. at 581. Since the founding of this country, "arms" has included "all firearms" that a person can "bear." *Id.* ("The 18th-century meaning is no different from the meaning today."). Further, the Second Amendment presumptively protects "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *see also Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (holding stun guns to be protected arms). While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense"—including machineguns. *Bruen*, 142 S. Ct. at 2132. Thus, the plain language of the Second Amendment covers machineguns under the first step of the *Bruen* test (plain text), meaning that § 922(o) is presumptively unconstitutional.

Turning to the second step of the *Bruen* test, whether banning machinegun possession is consistent with our country's historical traditions in regulating guns, *Bruen* makes clear that the focus of the analysis on the type of "arms" at issue lies in whether they are commonly possessed for self-defense: "we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that "are highly unusual in society at large." *Id.* (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today. *Bruen*, 142 S. Ct. at 2143. Banning the possession of commonly used "arms" does not comply with the dictates of the Second Amendment. *Id.* (recognizing that laws limiting self-

defense laws in effect at the time of the Second Amendment's passage "merely codified the existing common-law offense of bearing arms to terrorize the people.").

The carrying of weapons to have at the ready for self-defense is at the crux of the historical right to bear arms: The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."). *Id.* at 2148-50.

Machine guns are unquestionably in common use today for the purposes of self-defense. In fact, as of April 2020, there were more than 726,000 machineguns lawfully possessed in the United States and registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives.[1] As of May 2021, that number had increased to more than 740,000 machineguns lawfully possessed and registered in the United States.[2] These figures demonstrate that the legal market for machineguns in the United States has not only remained robust since Congress began regulating their possession in the mid-1930's, but has in fact grown by more than 150% in the three decades since Congress enacted a purported ban on the possession of machine guns. The number of lawfully possessed machineguns is almost quadruple the number of lawfully possessed stun guns that Justice Alito found sufficient to characterize that weapon as "widely owned and accepted as a

---

[1] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2020, 15–16 (2021), available at https://www.atf.gov/file/149886/download.

[2] U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, 15–16 (2021), available at https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

legitimate means of self-defense." *Caetano*, 577 U.S. at 420 (Alito, J., concurring); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the United States sufficient to show the weapon was "in common use"). These figures also only include lawfully owned firearms that were grandfathered in from before the passage of § 922(o) in 1986. *See* 18 U.S.C. § 922(o)(2)(B); Pub. L. No. 99-308, sec. 102 (May 19, 1986). The actual number of machine guns currently owned by Americans is undoubtedly significantly higher. Even unlawfully owned machine guns count for the purposes of assessing whether it is in "common use." *Cf. Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (explaining "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."). Thus, as set forth above, section 922(o) is thus facially unconstitutional.

In this case, Mr. Caldwell possessed the purported machine gun in Cleveland, Ohio. There is no evidence in this case that Mr. Caldwell ever used the gun the police found. There is no evidence that Mr. Caldwell ever breached the peace or harmed others using the gun. His simple possession of the gun was rather a clear exercise of his constitutional right under the Second Amendment to carry a commonly used weapon to have in case he needed to use it in his own self-defense. Section 922(o) is unconstitutional both facially and as applied to Mr. Caldwell.

## V.    Conclusion

"The Second Amendment guaranteed to all Americans the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2156

(internal quotation marks omitted). Sections 922(g)(1) and (o)'s total lifetime and automatic ban on Mr. Caldwell's possessing a firearm governs conduct covered by the Second Amendment and is inconsistent with this Nation's historical tradition of firearm regulation. Because the statute runs afoul of the Second Amendment, both on its face and as applied, it is unconstitutional. This Court therefore should dismiss the section 922(g)(1) charges (counts 3 through 6) and the section 922(o) charge (count 2) in the indictment against Mr. Caldwell.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/Carolyn M. Kucharski*
CAROLYN M. KUCHARSKI
Assistant Federal Public Defender
Ohio Bar: 0062119
1660 West Second Street, Suite #750
Cleveland, OH 44113
(216) 522-4856 Fax: (216) 522-4321